**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LA QUINTA FRANCHISING LLC,<br><br>*Plaintiff,*<br><br>v.<br><br>ALSBURY HOSPITALITY, INC. et al.,<br><br>*Defendants/Counterclaimants/Third-Party Claimants,*<br><br>v.<br><br>LQ MANAGEMENT LLC and TRAVEL & LEISURE LLC,<br><br>*Third-Party Defendants.* | 22-cv-05184 (MEF)(ADS)<br><br>**OPINION and ORDER** |

**Table of Contents**


**I. Background**

**II. Breach of Contract**

- **A. Release**
- **B. Rescission**
- **C. Earlier Breach**
  - **1. Protected Territory**
  - **2. Property Improvement Plan**
  - **3. The Employee Safety Device Fee**
  - **4. Reservation System**

## III. Conclusion

* * *

A hotel franchisee swapped out the branded signs from its building and took on a different name.

Did this, plus some other things, violate the franchise agreement? The franchisor, which managed the hotel brand, thought so --- and sued for breach of contract.

The franchisor has now moved for summary judgment.

The motion is granted in part.

* * *

## I. Background

There are two main players here.

First, an international franchisor[1] that controls certain hotel brand names.[2] And second, a company[3] set up to operate a hotel.[4]

In 2020, the two companies struck a deal and signed a contract. See Plaintiff's SOMF ¶ 6; Defendant's SOMF ¶ 6.

The contract was labeled a "franchise agreement." See Plaintiff's SOMF ¶ 6 (cleaned up); Defendant's SOMF ¶ 6 (cleaned up).

* * *

Per the franchise agreement, the hotel operator was allowed to use some of the franchisor's brand names. See Plaintiff's SOMF ¶ 7; Defendant's SOMF ¶ 7. And the hotel operator got some

---

[1] La Quinta Franchising LLC.

[2] See Statement of Undisputed Material Facts on Behalf of La Quinta Franchising LLC and LQ Management L.L.C. ("Plaintiff's SOMF") (ECF 82-2) ¶ 1, 7; Response to Plaintiff's Statement of Undisputed Facts and Statement of Undisputed Facts in Opposition ("Defendant's SOMF") (ECF 83-1) ¶ 1, 7; Exhibit 3 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("Disclosure Document") (ECF 82-7) at 74 (stating that the Plaintiff has around 590 hotels in the United States and Canada).

[3] Alsbury Hospitaly, Inc.

[4] See Plaintiff's SOMF ¶ 3, 6; Defendant's SOMF ¶ 3, 6.

other benefits, too. Like access to a computerized system that would allow customers to reserve rooms. See Exhibit 2 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("Franchise Agreement") (ECF 82-6) § 4.2.

In exchange, the hotel operator would have to pay fees to the franchisor, plus a percentage of revenue. See id. § 7.

These arrangements were due to run until 2038, when the franchise agreement would expire. See Plaintiff's SOMF ¶ 7; Defendant's SOMF ¶ 7.

* * *

But problems came on quickly.

The hotel operator fell behind on its payments, for example. See Plaintiff's SOMF ¶ 49; Defendant's SOMF ¶ 49. And the franchisor cut the hotel out of the online reservation system. See Plaintiff's SOMF ¶ 49; Defendant's SOMF ¶ 49.

Against this backdrop, the hotel operator walked away from the franchisor-controlled brand names. It took down the signs that had displayed those brand names. See Plaintiff's SOMF ¶ 24; Defendant's SOMF ¶ 24. And it started using an entirely new hotel name. See Plaintiff's SOMF ¶¶ 11, 24; Defendant's SOMF ¶¶ 11, 24.

* * *

In light of all this, the franchisor sued the hotel operator.

The gist: taking down the signs ended the parties' relationship, and that required the hotel operator to pay damages --- but he operator did not do so. See Complaint (ECF 1) ¶¶ 29-35.

This nonpayment, per the franchisor, amounted to a breach of contract.[5]

[5] There are other legal claims here, too. See Complaint ¶¶ 25-28, 36-44. Those are briefly addressed in Part III.

From here, the franchisor is called "the Plaintiff" and the hotel operator is "the Defendant."[6]

The Plaintiff has now moved for summary judgment on its claims. See Notice of Motion for Summary Judgment (ECF 82).[7]

The motion is before the Court.

## II. Breach of Contract

As noted, the Plaintiff's core claim is that the Defendant violated the franchise agreement --- and that this adds up to a breach of contract.

How so? In 2022, the Defendant took down the hotel's signs and started using a new name. See Plaintiff's SOMF ¶¶ 11, 24; Defendant's SOMF ¶¶ 11, 24.

That is sometimes called "debranding." See, e.g., Shell Oil Co. v. A.Z. Servs., Inc., 990 F. Supp. 1406, 1408, 1415 (S.D. Fla. 1997).[8] And when it comes to debranding, the franchise agreement is clear --- if the Defendant goes that route, the Plaintiff can terminate the agreement and then the Defendant must pay damages.[9]

---

[6] There are other parties in this case. Guarantors, for instance. In Part III, they are considered. See Complaint ¶¶ 45-48.

[7] The Plaintiff has also moved for summary judgment on the Defendant's counterclaims and third-party claims. See Notice of Motion for Summary Judgment (ECF 82). Those are addressed in Part III.

[8] See also Motiva Enter. LLC v. W.F. Shuck Petroleum, 2012 WL 601245, at *3 (D. Conn. Feb. 22, 2012); Citgo Petroleum Corp. v. Ranger Enters., Inc., 632 F. Supp. 2d 878, 890-91 (W.D. Wis. 2009); Sun Chase Enters., Inc. v. Swati Enters., Inc., 143 S.W.3d 902, 904 (Tex. Ct. App. 2004).

[9] See Franchise Agreement § 11.2 ("[The Plaintiff] may terminate this Agreement . . . when . . . [the Defendant] discontinue[s] operating the [hotel] [under the Plaintiff's brand.]"); id. § 12.1 ("If [the Plaintiff] terminate[s] this Agreement under Section 11.2 . . ., [the Defendant] will pay [damages to the Plaintiff] within 30 days following the date of termination[.]").

The parties agree that the Defendant debranded, and that it did not pay damages.[10]

This makes for a straightforward case --- and unless there is a solid counterargument, the Plaintiff's breach of contract claim is plainly a winner.

Are there counterarguments here? Yes, the Defendant presses three kinds. Work through them below, each in turn.

### A. Release

First, the Defendant contends that the Plaintiff gave up its legal claims against the Defendant. See Brief in Opposition to Plaintiff's Motion for Summary Judgment in the Matter La Quinta Franchising, LLC v. Alsbury Hospitality, Inc. et al. ("Defendant's Brief") (ECF 83) at 5.

And because of this release, the argument goes, the Plaintiff cannot now press its breach of contract claim. See id.; see generally Weisman v. N.J. Dept. of Human Servs., 982 F. Supp. 2d 386, 391 (D.N.J. 2013).

Was there a release? Arguing yes, the Defendant points to a 2022 letter that it sent to the Plaintiff,[11] to which the Plaintiff responded a couple of months later, with a letter of its own.[12]

But these back-and-forth letters do not add up to an enforceable release.

Even if the Defendant's 2022 letter might be taken as offering a release, the Plaintiff did not accept that offer in its letter back. Rather, the Plaintiff's letter demanded that the Defendant stick to its contractual obligations, including by paying the termination damages said to be required under the franchise agreement. See Plaintiff's Letter at 1. With its

---

[10] No one argues here that the Plaintiff failed to properly exercise the right to termination that debranding gave it.

[11] See Exhibit 7 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("Defendant's Letter") (ECF 82-11).

[12] See Exhibit 8 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("Plaintiff's Letter") (ECF 82-12).

letter, the Plaintiff was not giving up any of its legal rights, as it would be if it were accepting a release. The Plaintiff was instead taking the opposite approach. Saying that it still had those rights --- and would be pursuing them.

To put it in doctrinal terms, releases under New Jersey law[13] "are treated as contracts." Nye v. Ingersoll Rand. Co., 783 F. Supp. 2d 751, 762 (D.N.J. 2011). They must be assessed using "traditional contract principles." Mullen v. N.J. Steel Corp., 733 F. Supp. 1534, 1548 (D.N.J. 1990). So for a release to be binding, someone must offer a release and someone else must accept that release. See Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 439 (App. Div. 2016).

Applied here, the Defendant essentially contends that its 2022 letter was an offer of a release --- and that the Plaintiff's letter back was an acceptance of that offer.

But to work, an acceptance must mirror the offer by "agree[ing] on [the] essential terms." Flanzman v. Jenny Craig, Inc., 244 N.J. 119, 135 (2020) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)); see also Pagnani-Braga-Kimmel Urologic Assoc., P.A. v. Chappell, 407 N.J. Super. 21, 27-28 (Law. Div. 2008); State v. Ernst & Young, L.L.P., 386 N.J. Super. 600, 612 (App. Div. 2006).

That did not happen here.

The Plaintiff's letter back to the Defendant demanded damages. This is all but the opposite of agreeing to give up, to release, the claims that formed the basis for those damages. The Defendant's offer of a release was rejected when the Plaintiff responded to it by saying it would be seeking damages.

Bottom line: because there was no acceptance, no contract was formed --- and so there is no release to now enforce.

### B. Rescission

The Defendant presses a second argument against the Plaintiff's breach of contract claim. That the Plaintiff misrepresented some things during negotiations. See Defendant's Brief at 1, 2, 5-6, 11-20. Which induced the Defendant to enter into the

---

[13] The franchise agreement is interpreted under New Jersey law. See La Quinta Franchising LLC v. Alsbury Hosp., Inc., 2025 WL 1837667, at *2-7 (D.N.J. July 3, 2025).

franchise agreement. See id. at 1. And which entitles the Defendant to rescind the agreement. See Second Amended Answer, Counterclaim and Third Party Complaint ("Answer") (ECF 39) ¶¶ 111, 116.[14]

* * *

Arguments like this can sometimes work.

"New Jersey courts recognize that, under ordinary contract princip[les], transactions entered into in reliance upon material misrepresentations are voidable." Massey v. Trump's Castle Hotel & Casino, 828 F. Supp. 314, 325 (D.N.J. 1993) (citing Konsuvo v. Netzke, 91 N.J. Super. 353, 367 (Ch. Div. 1966)); see also Giaccone v. Canopius U.S. Ins. Co., 133 F. Supp. 3d 668, 674 (D.N.J. 2015); Daibo v. Kirsch, 316 N.J. Super. 580, 590-91 (App. Div. 1998).

And because rescission, where it applies, unwinds the contract, it can work as a defense to a breach-of-contract claim. See FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd., 608 U.S. 608, 615 (2026).

Were there any misrepresentations here? To answer, look to the disclosure document in this case --- a packet of information that the Plaintiff handed over to the Defendant before anyone signed the franchise agreement.[15]

* * *

---

[14] These allegations are also the basis of the Defendant's counterclaims for negligent and intentional misrepresentations. See Answer ¶¶ 105-16.

[15] See Plaintiff's SOMF ¶ 8; Defendant's SOMF ¶8. When the Defendant's owner signed the franchise agreement, he acknowledged that he "read [the] disclosure document" and "received [the disclosure document] at least 14 days" in advance. Franchise Agreement §§ 17.7.1, 17.7.2. And he signed a receipt to show that he had been given the materials. See Exhibit 4 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment (ECF 82-8). This handover was required by law --- disclosure documents must generally be given to franchisees before they sign franchise agreements. See 16 C.F.R. § 436.2(a).

The Defendant alleges that the Plaintiff left various things out of the disclosure document. See Defendant's Brief at 2, 5-6, 11-20.

Take those up now.

* * *

First, the Defendant argues that the disclosure document failed to list some of the fees that the Plaintiff later charged. See Defendant's Brief at 2, 10, 11-19.

Start with the so-called "continuing education fee." See Defendant's Brief at 12. The Plaintiff charged that fee. See Exhibit 9 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("Itemized Fees") (ECF 82-13) at 1-10. But the disclosure document lists it by name --- so no disclosure problem. See Disclosure Document at 22.

Next, take the "member benefit commission." See Defendant's Brief at 13. Charged, yes. See Itemized Fees at 1-10. But listed out in the disclosure document. See Disclosure Document at 24. So no issue.

Finally, the Plaintiff charged a "housekeeping maintenance fee." Defendant's Brief at 12; see Itemized Fees at 1-10. But the disclosure document laid out a mobile operations fee, and that fee covered the substance of the housekeeping maintenance fee --- it was "for the required mobile device-based system for managing housekeeping . . . functions at [the hotel]." Disclosure Document at 23; see Reply Brief of Plaintiff La Quinta Franchising LLC and Third Party Defendant LQ Management L.L.C. in Further Support of Their Motion for Summary Judgment ("Plaintiff's Reply Brief") (ECF 84) at 7.

* * *

Second, the Defendant contends that the Plaintiff made a misrepresentation before the sale of the hotel to the Defendant --- as to whether the Plaintiff had inspected the hotel building. See Defendant's Brief at 1-2, 20; Defendant's SOMF ¶ 37.[16]

---

[16] The Court assumes for present purpose that the hotel was not previously inspected. But there are indications that it was. See Defendant's SOMF ¶ 44; Exhibit 13 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ

But the disclosure document says nothing one way or another about the building's inspection history.[17]

So the Defendant must base any misrepresentation argument on information left out, on an omission by the Plaintiff.

For an omission to count as a misrepresentation, the assertedly "breaching party [must] owe[] an independent duty imposed by law." Argabright v. Rheem Mfg. Co., 201 F. Supp. 3d 578, 603-04 (D.N.J. 2016) (quoting Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 314-16 (2002)).[18]

But franchisors generally have no common-law duty to make disclosures to franchisees. See Tryp Hotels Worldwide, Inc. v. Sebastion Hotel, LLC, 726 F. Supp. 3d 373, 387-90 (D.N.J. 2024). And all the more so where, as here, the franchisee has real industry experience. See id. at 389; Defendant's SOMF ¶ 25 (indicating that the Defendant's owner had "twelve to fourteen hotels" at the time of contracting).

So the Defendant cannot base its misrepresentation argument on any failure to disclose the hotel's inspection history.[19]

---

Management L.L.C.'s Motion for Summary Judgment (ECF 82-17) at 2. One way or another, after the Defendant bought the hotel, the Plaintiff began inspecting and demanded extensive changes. See Defendant's SOMF ¶ 37. The Defendant's argument rests on the idea that had it known about the lack of pre-purchase inspections, it might have surmised that the hotel was in bad shape --- and, in light of that, might have passed on buying it.

[17] And the franchise agreement also says nothing about it.

[18] Though the disclosure document here is required by the FTC, see footnote 15, the FTC's rules do not require that inspection histories be disclosed. See 16 C.F.R. § 436.5(a)-(h).

[19] The Defendant also argues that not disclosing the absence of inspections was "in direct contravention of the [disclosure document]," Defendant's Brief at 5, and it points to a particular part of the document. See Exhibit H to Certification of Michael A. Orozco, Esq. in Opposition to Plaintiff's Motion for Summary Judgment (ECF 83-10) at 58-59. But this is a misread. The cited section of the disclosure document speaks to the Defendant's right to perform inspections after the hotel opens --- it does not establish any duty to perform inspections before the hotel opens. See Disclosure Document at 49-50.

* * *

Third, the Defendant points to the disclosure document's section for "Pending Litigation" and "Resolved Litigation" --- and claims that the Plaintiff failed to put down at least one case that should have been listed there. See Defendant's Brief at 5; Disclosure Document at 13-16.[20]

The basis for the Defendant's argument: another document, apparently prepared by the Plaintiff's parent company, that references a "settlement agreement." Exhibit E to Certification of Michael A. Orozco, Esq. in Opposition to Plaintiff's Motion for Summary Judgment (ECF 83-7) at 19. Plus another document that cites that same settlement agreement. See id. at F-37. And finally, an announcement that the parent company made payments to resolve "open issues." Exhibit D to Certification of Michael A. Orozco, Esq. in Opposition to Plaintiff's Motion for Summary Judgment (ECF 83-6) at 2.

From these references to settlement agreements and other payments, the Defendant argues that the Plaintiff "clearly withheld evidence of litigation." Defendant's Brief at 20.

But that reads too much from too little. See Plaintiff's Reply Brief at 7 (explaining).

The cited documents show that the Plaintiff paid money to settle one or more disputes. But entities routinely settle disagreements without first going to court. See Scott A. Moss, Illuminating Secrecy: A New Economic Analysis of Confidential Settlements, 105 Mich. L. Rev. 867, 883 (2007) (discussing the prevalence of certain pre-filing settlements); Robert H. Mnookin & Lewis Kornhauser, Bargaining in the Shadow of the Law: The Case of Divorce, 88 Yale. L.J. 950, 951 (1979) (same for other sorts of pre-filing settlements).

Because of this, the fact that a dispute was settled does not mean that it was litigated. But that is the (erroneous) premise of the Defendant's argument --- that the Plaintiff's settlements imply that there must have been litigation before the settlement.

There is no reason to think that is right. And so there is no reason to think that something was missing from the disclosure

---

[20] This is required by FTC rules --- a franchisor must disclose certain "civil action[s]." See 16 C.F.R. § 436.5(c).

document, a piece of "[p]ending [l]itigation" or "[r]esolved [l]itigation" that was not disclosed by the Plaintiff.[21]

### C. **Earlier Breach**

The Defendant's final argument: it took down the hotel signs, and maybe that would normally be a breach of contract, but before that the Plaintiff had breached its own obligations under the franchise agreement. See Defendant's Brief at 4-5; Answer ¶¶ 89, 121. And so, the Defendant's argument goes, the Plaintiff's earlier breach absolved it (the Defendant) of any obligation to keep following the agreement --- including by leaving the signs up. See Defendant's Brief at 4-5.

* * *

As a general matter, earlier-breach arguments can sometimes work.

"When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement." Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472 (1990); see Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024); Days Inn Worldwide, Inc. v. Ash Mgmt. Corp., 2026 WL 1534423, at *2 n.9 (D.N.J. June 1, 2026); Tryp Hotels Worldwide, Inc., 726 F. Supp. 3d at 391.[22]

---

[21] In its Answer, the Defendant also asserted that the Plaintiff misrepresented (i) the financial performance of other franchisees and (ii) the quality assurance scores of the hotel. See Answer ¶¶ 10, 45-50. But the Defendant skipped over all of this in its legal brief --- even though the Plaintiff brought it up in its brief. See Brief of Plaintiff La Quinta Franchising LLC and Third Party Defendant LQ Management L.L.C. in Support of Their Motion for Summary Judgment ("Plaintiff's Brief") (ECF 82-1) at 16-18. "[A] party's failure to raise a defense in opposition to summary judgment forfeits that defense, even if the party raised it in an answer earlier in the litigation." DLJ Mortg. Cap., Inc. v. Stevens, 167 F.4th 632, 635 (3d Cir. 2026). So the Defendant has forfeited the two failure-to-disclose arguments mentioned in this footnote.

[22] New Jersey law is no outlier here. What is cited in the text is a bread-and-butter principle of contract law. See also 23 Williston on Contracts § 63:3 (4th ed. 2026); 10 Corbin on

So the question is whether the Plaintiff materially breached the agreement before the Defendant took down the signs.[23]

* * *

The Defendant suggests that there were four different earlier breaches. Consider each of these below.

### 1. Protected Territory

The Defendant first argues that its debranding was excused by the Plaintiff's earlier decision to allow other hotels to open near the Defendant's hotel --- which, per the Defendant, was a breach of the franchise agreement. See Defendant's Brief at 5.

This argument invokes the Defendant's "protected territory" --- an area in which, under the franchise agreement, the Plaintiff could not let other franchisees open hotels. See Exhibit L to Certification of Michael A. Orozco, Esq. in Opposition to Plaintiff's Motion for Summary Judgment (ECF 83-14) ¶ 12.

The Defendant contends that its "protected territory" covered any place within 10 miles of its hotel. Id. ¶ 11.

But this runs aground on the franchise agreement. The agreement provides for a protected territory. See Franchise Agreement § 2. But that territory is defined as an area bounded by certain streets --- not marked out based on a distance from the Defendant's hotel. See id.

---

Contracts § 53.4 (2026); Restatement (Second) of Contracts § 237 (1981).

[23] When a party materially breaches, "the injured party [then] has a genuine election offered him of continuing performance or of ceasing to perform, and any action indicating an intention to perform will operate as a conclusive choice . . . depriving him of any excuse for ceasing performance on his own part." Frank Stamato & Co. v. Borough of Lodi, 4 N.J. 14, 21 (1950) (quoting 5 Willison on Contracts (Rev. Ed.) 3749); see also S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 376 (3d Cir. 1992); Tryp Hotels Worldwide, 726 F. Supp. 3d at 391. The Court assumes without deciding that the Defendant's actions in taking down the signs count as a timely "election" of termination. It is on this assumption that an earlier material breach by the Plaintiff can potentially excuse a later breach by the Defendant.

No evidence has been put forward to suggest that the Plaintiff let franchisees open hotels within the protected territory as the franchise agreement defines it. So there can be no breach of contract premised on that provision, let alone what is needed to make the Defendant's argument work --- an earlier breach.[24]

* * *

The Defendant has a backup argument.

It says that the Plaintiff breached the implied covenant of good faith and fair dealing by allowing hotels to be opened too close to the Defendant's hotel. See Defendant's Brief at 5.

"[A] breach of [the implied] covenant, if material, could excuse performance by the non-breaching party." Grande Village LLC v. CIBC Inc., 2018 WL 2192707, at *32 (D.N.J. 2018) (collecting cases).

And a party can breach the implied covenant "even though that performance does not violate a pertinent express term." Fields v. Thompson Printing Co., Inc., 363 F.3d 259, 271 (3d Cir. 2004) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001)). So it does not matter, the Defendant contends, that there is no proof that the precise "protected territory" provision of the franchise agreement was violated here.

But the implied covenant "cannot override an express term in a contract." Wilson, 168 N.J. at 244.

And here, the franchise agreement expressly grants the Plaintiff the right to allow hotels to open "anywhere" outside the protected territory. See Franchise Agreement § 2 ("We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.").[25]

---

[24] A wrinkle. The area marked out as protected territory in the franchise agreement is in a different city than the Defendant's hotel. That may have been a mistake. And if it was, it may have provided a basis for reformation. See Alexander v. CIGNA Corp., 991 F. Supp. 427, 442 (D.N.J. 1998). But no party seeks that here.

[25] Cf. Franchise Agreement § 2 ("You acknowledge that the Protected Territory fairly represents the Facility's trading area and that there are no express or implied territorial rights

### 2. Property Improvement Plan

The Defendant next argues that its later debranding was excused by the Plaintiff's earlier demand that the Defendant improve the hotel --- another alleged breach of contract. See Defendant's Brief at 1-2.

* * *

The background to this argument follows.

About a week before the Defendant signed the franchise agreement, it signed another document. See Exhibit 13 to Declaration of Kendra Mallet in Support of La Quinta Franchising LLC's and LQ Management L.L.C.'s Motion for Summary Judgment ("PIP Agreement") (ECF 82-17).

That document listed various ways in which the hotel needed to improve, so as to measure up to the Plaintiff's standards. See id. at 3-12. Like putting a TV in the breakfast area. See id. at 5. And speeding up the internet. See id. at 4.

The franchise agreement then required those improvements. See Franchise Agreement § 18.2. And the Plaintiff later demanded that they be made. See Defendant's Brief at 2.

* * *

The Defendant argues that it could not be required to spend more than $75,000 on hotel improvements. See Answer ¶ 65. And it suggests that the Plaintiff breached the franchise agreement by demanding more than that. See Defendant's Brief at 2.

But there are two problems with this.

First, there is no evidence that the Defendant paid anything for hotel improvements. And there is also no proof that the Plaintiff made any hotel-improvement demands of more than $75,000. Or, for that matter, that it made any demands at all.

Second, none of the relevant documents say that there was a $75,000 annual limit. Not the franchise agreement. See

---

or agreements between the parties except as stated in this Section.").

Franchise Agreement § 18.2. And not the document detailing the necessary improvements.[26]

### 3. The Employee Safety Device Fee

Next, the Defendant argues that its obligations were excused because the Plaintiff earlier charged an employee safety device fee --- and that breached the franchise agreement because the fee was not listed in any of the relevant documents. See Defendant's Brief at 12.[27]

To excuse nonperformance, an earlier breach must be material. See Nolan by Nolan, 120 N.J. at 472.

And whether a breach is material depends on whether it "goes to the essence of the contract." Roach v. BM Motoring, LLC, 228 N.J. 163, 174 (2017) (quoting Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961)). That requires considering things like the "ratio quantitatively which the breach bears to the contract as a whole," as well as the "probability or improbability that such a breach will be repeated." Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 286 (App. Div. 1998) (cleaned up).

Applying these standards, the employee safety device fee plainly did not clear the "material" bar.

---

[26] The Defendant has another argument --- that it was verbally told that costs would be capped at $75,000 per year. See Answer ¶ 63. But this does not work. For one, courts generally "prohibit[] the introduction of evidence that tends to alter an integrated written document." Chance v. McCann, 405 N.J. Super. 547, 563 (2009) (internal quotation omitted). And the franchise agreement is integrated. See Franchise Agreement § 17.7.4. Moreover, the Defendant has not presented evidence of any verbal promise --- just assertions in its answer. And even if the assertions in the answer were to be counted here, the alleged statements in question were made by the hotel seller and its brokers --- not by the Plaintiff. See Answer ¶ 63. The Defendant has not offered evidence that these statements should be imputed to the Plaintiff, perhaps on a principal/agent theory. (Indeed, the Defendant has indicated that the broker did not represent the Plaintiff. See Defendant's SOMF ¶ 30.)

[27] The Court assumes for these purposes that this asserted overcharge can be chalked up as a breach of contract.

The fee was only $35 per month. See Itemized Fees at 1-10. And that needs to be stacked up against the overall fees here --- typically between $10,000 and $17,000 per month. See id. This means that in some months, the $35 overcharge added up to only 0.2% of the value of the contract fees. In the higher months, the percentage veered up a bit. But only a bit --- it occasionally inched up toward 0.4%.

That is a small drop in a large bucket. Even if it was overcharged by 0.4%, that is not a material breach --- a breach this small did not deprive the Defendant of the benefit which it reasonably expected. See Roach, 228 N.J. at 174-75 (citing Restatement (Second) of Contracts § 241(a) (1981)).

And all the more so when compared to the "essence," Roach, 228 N.J. at 174-75, of the contract here --- the Defendant being allowed to use a nationally-known brand name and getting access to a computerized reservation system, all in connection with a 102-room, $4 million hotel. See Defendant's SOMF ¶¶ 6, 31, 49.

In this context, a $35 monthly overcharge cannot count as a material breach. See Farnam Street Fin., Inc. v. Elektrafi Inc., 2026 WL 1622746, at *3 n.2 (D. Minn. June 5, 2026) (suggesting that minor overcharges are not material breaches); City of Meridian v. Petra Inc., 154 Idaho 425, 444 (2013) (concluding that overcharging $220,000 was not a material breach because it was only 1.03% of the project price); Clower v. Orthalliance, Inc., 337 F. Supp. 2d 1322, 1333 (N.D. Ga. 2004) (concluding that a $8,000 shortfall on a one-million-dollar contract was not a material breach).[28]

**4. Reservation System**

Finally, the Defendant argues that its alleged breach --- taking down the signs and not paying damages --- is excused by the Plaintiff's breach from about a month before, when it removed

[28] Other considerations may go the other way. For instance, the fact that the breach was a recurring one --- the $35 was charged every month. See Magnet Resources, Inc., 318 N.J. Super. at 286. This moves the needle in the direction of a material-breach conclsion, but not far enough.

the Defendant from the computerized reservation system. See Defendant's Brief at 10; Defendant's SOMF ¶ 49.[29]

But the Plaintiff has a response to that. That it did not breach the contract, but stuck to it.

Per the Plaintiff, the Defendant fell behind on payments. See Plaintiff's SOMF ¶ 49. And the franchise agreement allowed the Plaintiff to suspend reservation system access when that happened. See Plaintiff's Reply Brief at 3-4; Franchise Agreement § 11.5 ("[The Plaintiff] may suspend the [hotel] from the Reservation System for any . . . failure to pay . . . under this Agreement.").

Exercising a contractual right does not break the contract. See Nash Distribs., Inc. v. Guinness Bass Import Co., 2005 WL 8175790, at *4 (D.N.J. Aug. 26, 2005) ("[A party's] performance of its express contractual right to terminate [its counterparty] is not a breach of contract.").

And from the Plaintiff's perspective, that was all that was going on. It had a right to remove the Defendant from the reservation system. And it did just that; its "earlier" action was not a breach of the contract, according to the Plaintiff, but rather was affirmatively allowed by it.

* * *

But the problem with the Plaintiff's argument is that it ignores what the Defendant says back.

In its legal papers, the Defendant argues that being removed from the reservation system was improper; it had fallen behind on required payments, but those were illegitimate in the first place. See Defendant's Brief at 11-17.[30]

---

[29] There can be little doubt that suspension from a reservation system can count as a material breach. See Baymont Franchise Sys. v. SB Hosp. Palm Springs, LLC, 2022 WL 2063623, at *5 (D.N.J. June 8, 2022); Travelodge Hotels, Inc. v. Huber Hotels, LLC, 2022 WL 44634, at *5 (D.N.J. Jan. 5, 2022); Red Roof Franchising, LLC v. Riverside Macon Grp., LLC, 2020 WL 2494462, at *4-5 (S.D. Ohio May 14, 2020); Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc., 357 F. Supp. 2d 788, 797 (D.N.J. 2005).

[30] For instance, the Defendant contends that the Plaintiff was charging a "Global Distribution System fee" on "reservations

As to this argument, the Plaintiff's legal papers provide no meaningful response.

So the Court will give the parties a chance to flesh this out.[31] After that, the Court will take up this issue.[32]

## III. Conclusion

Where things stand.

In the absence of a persuasive counterargument, it appears that the Plaintiff is entitled to summary judgment on its breach of contract claim.

The Defendant's counterarguments as to release and rescission are not persuasive. See Part II.A, Part II.B. And most of the Defendant's counterarguments as to earlier breaches by the Plaintiff are not persuasive, either. See Part II.C.1, Part II.C.2, Part II.C.3.

But the Court cannot yet address one of the Defendant's earlier-breach counterarguments, related to disputes in the run-up to the Plaintiff being removed from the online reservation system. See Part II.C.4. The briefing is not there.

In light of this, the Court will seek supplemental legal papers, limited to just that point.

---

from Booking.com and Agoda," even though these platforms are not global distribution systems. Defendant's Brief at 17 (cleaned up). According to the Defendant, somewhere between sixty and ninety percent of the GDS fees were disputed. See Defendant's Brief at 12, 17.

[31] In many circumstances, failure to respond to an argument counts as a waiver or a concession. But here, the Defendant's argument did not come across clearly. The relevant argument crops up in the middle of the Defendant's brief --- raised via an excerpt from a deposition. See Defendant's Brief at 17. The Plaintiff seems to have missed the argument, and it is not hard to see why.

[32] There are some other theories of earlier breach described in the Defendant's answer. See Answer ¶ 120. But there is no follow-through on these in the Defendant's legal briefs, even though the Plaintiff took them up. See Plaintiff's Brief at 16-20. That adds up to forfeiture. See footnote 21.

* * *

Before finishing, three things.

First, as to the Plaintiff's request for summary judgment on the Defendant's counterclaims.

The Defendant's intentional and negligent misrepresentation counterclaims are mirror images of the rescission defenses the Defendant pressed. For the reasons discussed in Part II.B as to those defenses, summary judgment must be granted on the negligent and intentional misrepresentation counterclaims.

Second, the Minnesota Franchise Act has no bearing here. See La Quinta Franchising LLC, 2025 WL 1837667, at *2-7. Summary judgment must be granted as to that counterclaim, too.

Third, there are some open issues that do not make sense to address now. Like the Defendant's breach of contract counterclaim and its third-party claims. And the Plaintiff's other claims: for unpaid recurring fees, damages, attorneys' fees, and interest, plus claims against the guarantors. These all depend, in part, on how the Court resolves the reservation system issue. The Court will revisit the open issues later, after it closes on the reservation system question.

* * *

For the above-stated reasons, the Plaintiff's motion at ECF 82 is granted as to the Defendant's intentional and negligent misrepresentation counterclaims, and its Minnesota Franchise Act counterclaim.

IT IS on this 23rd day of September, 2026, **SO ORDERED.**

Michael E. Farbiarz, U.S.D.J.